McGREGOR W. SCOTT
United States Attorney
ANDRÉ M. ESPINOSA
KEVIN KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for Plaintiff
United States of America

**FILED**

JAN 0 6 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR0003 KJM |
| Plaintiff, | 18 U.S.C. § 371 – Conspiracy To Commit An Offense Against The United States; 18 U.S.C. §§ 2 and 1957(a) – Aiding and Abetting Money Laundering |
| v. | |
| RYAN GUIDRY, | |
| Defendants. | |

## I N F O R M A T I O N

COUNT ONE: [18 U.S.C. § 371 – Conspiracy to Commit an Offense Against the United States]

The United States Attorney charges: T H A T

RYAN GUIDRY,

defendant herein,

### I.    Background

At all times relevant to this Information,

1.    Company S, headquartered in Benicia, California, in the State and Eastern District of California, was a solar energy device manufacturing and sales corporation that primarily solicited investors to participate in transactions organized around the manufacture and deployment in the market of mobile solar generator units.

2.    Company D, headquartered in Benicia, California, in the State and Eastern District of

INFORMATION

1

1  California, was a separate corporation but closely related to Company S, and primarily responsible for

2  managing certain equipment sold in transactions closed by Company S.

3      3.      Although they were separate legal entities, which carried separate accounting and tax

4  obligations, Company S and Company D shared common employees and facilities, relied on common

5  leadership, and operated in material respects as a single entity (collectively the "Company").

6      4.      Individual 1 was a resident of Martinez, California, the owner and operator of Company

7  S, and the Chief Executive Officer of the Company.

8      5.      Individual 2 was a resident of Martinez, California, the owner and operator of Company

9  D, and the Chief Operations Officer of the Company.

10      6.      Individual 3 was a resident of Lafayette, California, and an attorney licensed to practice

11  law in California. Individual 3 was outside counsel to the Company, and provided legal and business

12  advice concerning the Company's operations. Individual 3 began working with the Company in

13  approximately April 2011.

14      7.      Co-conspirator Robert A. Karmann, charged elsewhere, was a resident of Clayton,

15  California, and the Chief Financial Officer for the Company. Co-conspirator Robert A. Karmann began

16  working for the Company in approximately August 2014.

17      8.      Defendant RYAN GUIDRY was a resident of Pleasant Hill, California, and the Vice

18  President of Operations for the Company. Defendant RYAN GUIDRY began working for the Company

19  in approximately May 2012.

20      9.      Individual 6 was a resident of Vacaville, California, and a former employee of Telecom

21  Company A. In that role, Individual 6 developed a business relationship with Individual 1 and the

22  Company in or about 2013. In or about November 2015, Individual 6 left Telecom Company A to join

23  the Company, where he worked until approximately February 2018.

24      10.      Individual 7 was a resident of Martinez, California, and was a fleet mechanic and

25  technician at the Company.

26      11.      Co-conspirator Ronald J. Roach, charged elsewhere, was a resident of Walnut Creek,

27  California, and a certified public accountant licensed in California. Co-conspirator Ronald J. Roach

28  maintained an accounting practice between 2003 and 2018 and began performing significant work for

1  the Company as early as the end of 2011.  Among other things, co-conspirator Ronald J. Roach prepared

2  complied annual financial statements for Company D for 2011 through 2017.

3       12.     Co-conspirator Joseph W. Bayliss, charged elsewhere, was a resident of Martinez,

4  California, a general contractor and electrician licensed in California, and the owner and operator of

5  Bayliss Innovative Services, Inc., a contracting services company.  Co-conspirator Joseph W. Bayliss

6  began performing work for the Company in late 2013.

7                                **II.    The Conspiracy**

8       13.     Beginning at a time no later than in or about March 2011, and continuing through in or

9  around January 1, 2019, in the County of Solano, State and Eastern District of California, and elsewhere,

10  defendant RYAN GUIDRY did knowingly and intentionally combine, agree, and conspire with Roach,

11  Bayliss, Karmann, Individuals 1, 2, 3, 6, and 7, and others known and unknown to the United States, to

12  commit an offense against the United States, that is, wire fraud in violation of Title 18, United States

13  Code, Section 1343.

14                                **III.    Manner and Means**

15      14.     In furtherance of the conspiracy, defendant RYAN GUIDRY and his co-conspirators

16  employed the following ways and means, among others:

17      15.     Directly and through subcontractors, the Company built and purported to build mobile

18  solar generators ("MSGs").  The MSGs, when actually built, consisted primarily of solar panels placed

19  on a wheeled-trailer that harvested and stored solar energy for later use by customers including at such

20  locations as concert venues, and construction sites, in remote areas and elsewhere.

21      16.     Company S, including through the sales efforts of Individual 1 and others, sold MSGs in

22  multi-unit packages to investors through special purpose investor funds created specifically for such

23  transactions.  These investment funds, sometimes called tax-equity funds ("Funds"), were permitted

24  under the federal tax code and purchased the MSGs with a combination of a cash payment and a long-

25  term promissory note payable to Company S.

26      17.     As part of the transactions, Company D leased those MSGs from the Funds and purported

27  to lease the MSGs to third parties to generate revenue.  In fact, the conspirators were often unable to

28  lease the MSGs to third parties, contrary to representations of the conspirators and others acting at their

1  directions that the market for MSGs was robust.

2      18.     To encourage investors to purchase MSGs from the Company and to avoid detection of

3  the scheme as it progressed, Individual 1 and other co-conspirators made material representations to

4  investors, through oral statements and written materials, including that (1) the MSGs would be built

5  and/or existed in quantities and conditions of operability consistent with the representations of the

6  conspirators; (2) Company D had leased and could lease the MSGs to third parties pursuant to written

7  lease agreements; (3) there was a substantial market for the MSG leases; and (4) the transactions

8  involving the MSGs and the Funds were structured in such a way that would allow the investors to

9  lawfully claim tax credits and other tax benefits related to the MSGs.

10     19.     In fact, those statements were materially false in that (1) the MSGs were not built in the

11  quantities represented and did not exist in the quantities and the conditions of operability represented;

12  (2) Company D had not leased and could not lease the MSGs in the quantities or on the terms

13  represented; (3) the market for MSG leases was significantly less than represented; and (4) the

14  transactions were not executed in a such a way that they could lawfully qualify for tax credits and other

15  tax benefits, in part, because the MSGs that formed the basis of the transactions often did not exist

16  and/or were not being used consistent with the representations made by the conspirators.

17     20.     To support the false claims made to investors and to avoid detection of the scheme, the

18  conspirators took steps including materially falsifying Commissioning Reports and other records related

19  to the MSGs and replacing Vehicle Identification Numbers ("VIN") on MSGs to make it appear that

20  more MSGs had been built than had actually been constructed.  In some instances, the conspirators sold

21  and/or attempted to sell the same MSGs to more than one Fund, switching the VIN numbers on existing

22  MSGs to defeat investor inspections.

23     21.     To further conceal the ongoing scheme and to encourage additional investments, the

24  conspirators also created the appearance of revenue from MSG leases by operating a Ponzi-type scheme.

25  Conspirators transferred investor money through entities they controlled to create the appearance that

26  Company D was collecting substantial amounts of third-party lease revenue from the MSGs that

27  Company D was then using to pay the Funds, which the Funds, in turn, paid Company S to service the

28  Funds' promissory notes.  In reality, approximately 94% or more of company D's purported MSG lease

INFORMATION                                    4

1  revenue came from money stolen from investors.

2      22.    To further the ongoing fraud and to avoid detection of the scheme, the conspirators

3  agreed to conceal the true financial structure of the Company and the true nature and extent of third-

4  party MSG leases from current and prospective investors through materially false representations and

5  supporting documents.  Among other means, the conspirators agreed to prepare and disseminate false

6  compiled annual financial statements, which falsely represented that Company D had earned revenue in

7  sufficient amounts to support its obligations under its master lease with the Funds.  The conspirators

8  completed those false financial statements knowing they would be shared with investors and intending

9  investors to rely on the false misrepresentations they contained.

10     23.    Between at least as early as March 2011 and December 18, 2019, at least twelve investors

11 entered into transactions with the Company through approximately thirty-four Funds.  Some investors

12 invested through more than one Fund.  The investors, through the Funds, collectively deposited by

13 interstate wire transfer approximately $759,000,000 into bank accounts for the Funds established for the

14 transactions.  Further, several financial institutions and other investors transferred collectively

15 $136,000,000 to the Company as part of related transactions for the purchase and lease of MSGs.  In

16 total, the Company closed transactions with Funds and other investors purportedly involving

17 approximately 17,000 MSGs, at approximately $2.5 billion in purported value.

18     24.    Due to the conspirators' false representations, many investors also claimed tax credits

19 and depreciation in connection with the transactions premised on the revenue allegedly generated by

20 Company D.  The tax value of the tax credits and depreciation claimed by the Funds, up to and including

21 the 2017 tax year, is approximately $902,000,000.  This figure does not account for approximately

22 $167,000,000 that investors paid into tax equity transactions in 2018.

23                          **IV.    Overt Acts**

24     25.    On or about April 21, 2015, co-conspirator Ronald J. Roach prepared a compiled 2014

25 financial statement for Company D, which falsely represented that Company D earned more than

26 approximately $14,234,000 in rental income.

27     26.    On or about November 18, 2015, co-conspirator Robert A. Karmann delivered by email

28 complied financial statements for Company D to a representative of investors in Fund 6 and Fund 12,

which falsely represented the amount of third-party lease revenue Company D earned during 2014.

27.     On or about February 23, 2016, co-conspirator Robert A. Karmann delivered by email written operation reports to investors in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

28.     On or about February 25, 2016, co-conspirator Robert A. Karmann delivered by email written operation reports and summaries of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the second, third, and fourth quarters of 2015.

29.     On or about May 3, 2016, co-conspirator Ronald J. Roach prepared a compiled 2015 financial statement for Company D, which falsely represented that Company D earned more than approximately $29,845,000 in rental income.

30.     On or about May 12, 2016, co-conspirator Robert A. Karmann delivered by email to investors in Fund 6 and Fund 12 a written summary, which falsely represented that MSGs sold to Fund 6 and Fund 12, and leased to third-party entities, earned sufficient lease revenue in 2015 to support payment of a profit to investors in Fund 6 and Fund 12.

31.     On or about May 13, 2016, co-conspirator Robert A. Karmann delivered by email a written operation report and summary of mobile facilities to investors in Fund 6, which falsely represented that MSGs sold to Fund 6 were leased to a third-party entity and earning income from that third-party entity during the first quarter of 2016.  In the same email, co-conspirator Robert A. Karmann also delivered a written operation report to investors in Fund 12, which falsely represented that MSGs sold to Fund 12 were leased to a third-party entity and earning income from that third-party entity during the first quarter of 2016.

32.     On or about May 10, 2017, co-conspirator Ronald J. Roach prepared a compiled 2016 financial statement for Company D, which falsely represented that Company D earned more than approximately $58,390,000 in rental income.

33.     On or about July 18, 2017, co-conspirator Ronald J. Roach, acting at the direction of Individual 1, delivered by email documents to an A Group executive, to which were attached financial

1  statements for Company D for 2014 through 2016, and an aging report that purported to set forth
2  payment history for MSG rentals by Telecom Company A pursuant to a fixed-term lease contract
3  purportedly between Telecom Company A and Company D.

4         34.    In or about September 2015, Individual 1 offered to pay defendant RYAN GUIDRY
5  $1,000,000 to obtain a signature on a purported lease agreement between Telecom Company A and
6  Company D.  Individual 1 also told defendant RYAN GUIDRY Individual 1 would pay whoever signed
7  the lease agreement $1,000,000.

8         35.    On or about September 11, 2015, Individual 6 signed the purported lease agreement
9  between Telecom Company A and Company D (the "September 11, 2015 Lease").

10        36.    In or about June 2017, Individual 1 told defendant RYAN GUIDRY that Individual 1
11  would pay $20,000 to the person at Telecom Company A that signed a certificate purporting to assign to
12  A Group/K Bank the right to receive revenue for MSG rentals by Telecom Company A, pursuant to the
13  September 11, 2015 Lease (the "2017 Certificate").

14        37.    In or about July 2017, defendant RYAN GUIDRY and Individual 6 forged a signature
15  approximating the name of a former Telecom Company A employee on that 2017 Certificate.

16        38.    On or about July 21, 2017, defendant RYAN GUIDRY delivered by email to Individual 1
17  the 2017 Certificate with the forged signature.

18        39.    On or about June 27, 2017, co-conspirator Joseph W. Bayliss, charged elsewhere,
19  completed and signed Commissioning Reports for MSGs associated with Fund 30, which involved
20  approximately 1,326 MSGs.

21        40.    On occasions in 2017 and 2018, in Benicia and Las Vegas, defendant RYAN GUIDRY
22  worked with Individual 1, Individual 7, co-conspirator Joe Bayliss, and others to scrape off VIN number
23  stickers from MSGs assigned to particular transactions and replace them with VIN number stickers
24  assigned to different transactions, in advance of inspections of those MSGs.

25        41.    In or about April 2018, at the direction of Individual 1, defendant RYAN GUIDRY
26  coordinated the deployment of MSGs to sites where MSGs associated with the A Group/K Bank
27  transaction were purportedly in use, before and on the day of inspections by investor representatives
28  associated with that transaction.

INFORMATION                                                    7

1    All in violation of Title 18, United States Code, Section 371.

2    COUNT TWO: [18 U.S.C. §§ 2 and 1957(a) – Aiding and Abetting Money Laundering]

3        The United States Attorney charges: T H A T

4                                RYAN GUIDRY,

5        42.    Paragraphs 1 through 41 of Count One of this Information are re-alleged and

6    incorporated by reference as if fully set forth herein.

7        43.    On or about August 22, 2017, in the County of Solano, in the State and Eastern District of

8    California and elsewhere, defendant RYAN GUIDRY knowingly and intentionally aided and abetted

9    Individual 1 and others known and unknown to the United States, to knowingly engage in and attempt to

10   engage in a monetary transaction affecting interstate commerce in criminally derived property of a value

11   greater than $10,000, that is, a $350,000 domestic wire transfer of funds drawn on an account controlled

12   by Individual 1 at H Bank, with an account number ending in 2416 and deposited in a bank account

13   controlled by PII LLC, such property having been derived from a specified unlawful activity, that is, a

14   scheme to defraud in violation of Title 18, United States Code, Section 1343, all in violation of Title 18,

15   United States Code, Sections 2 and 1957(a) .

16

17   Dated:  1/6/2020                          McGREGOR W. SCOTT
                                               United States Attorney

18
                                         By:  _____
19                                            ANDRE M. ESPINOSA
                                              Assistant United States Attorney
20

2:2 0 - CR 0 0 0 3  KJM

## United States v. RYAN GUIDRY
## Penalties for Information

**Defendants**
**RYAN GUIDRY**


**COUNT 1:**            **RYAN GUIDRY**

VIOLATION:          18 U.S.C. §371 - Conspiracy to Commit an Offense Against The United
                    States

PENALTIES:          Maximum sentence 5 years in prison; or
                    Fine of up to $250,000; or both fine and imprisonment
                    Supervised release of 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)


**COUNT 2:**            **RYAN GUIDRY**

VIOLATION:          18 U.S.C. §§ 2 and 1957(a) – Aiding and Abetting Money Laundering

PENALTIES:          Maximum of 10 years in prison; or
                    Fine of $250,000 or twice the value of the property involved in the
                    transaction; or both fine and imprisonment
                    Supervised release of 3 years

SPECIAL ASSESSMENT: $100 (mandatory on each count)