1  McGREGOR W. SCOTT
   United States Attorney
2  ANDRÉ M. ESPINOSA
   KEVIN KHASIGIAN
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5
   Attorneys for Plaintiff
6  United States of America

**FILED**

JAN 0 6 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

7
8                    IN THE UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,              CASE NO. 2:20 - CR 0 0 0 3  KJM

11                        Plaintiff,       PLEA AGREEMENT

12         v.                             DATE:   JANURY 14, 2020
                                          TIME:   9:15AM
13  RYAN GUIDRY,                          COURT:  HON. JOHN A. MENDEZ

14                        Defendant.

15

16                   I.      **INTRODUCTION**

17      **A.    Scope of Agreement.**

18          The Information in this case charges the defendant with violations of Title 18, United States'

19  Code, Section 371—Conspiracy to Commit an Offense Against the United States ("Count One"), and

20  Title 18, United States Code, Sections 2 and 1957(a)—Aiding and Abetting Money Laundering ("Count

21  Two"). This document contains the complete plea agreement between the United States Attorney's

22  Office for the Eastern District of California (the "government") and the defendant regarding this case.

23  This Plea Agreement is limited to the United States Attorney's Office for the Eastern District of

24  California and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory

25  authorities.

26      **B.    Court Not a Party.**

27          The Court is not a party to this Plea Agreement. Sentencing is a matter solely within the

28

PLEA AGREEMENT                          1

discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of the defendant, including activities which may not have been charged in the Information. The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this Plea Agreement.

If the Court should impose any sentence up to the maximum established by the statutes, the defendant cannot, for that reason alone, withdraw his guilty plea, and he will remain bound to fulfill all of the obligations under this Plea Agreement. The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence he will receive.

## II.     DEFENDANT'S OBLIGATIONS

### A.     Guilty Plea.

The defendant will plead guilty to violating Title 18, United States Code, Section 371—Conspiracy to Commit an Offense Against the United States ("Count One"), and Title 18, United States Code, Sections 2 and 1957(a)—Aiding and Abetting Money Laundering ("Count Two"). The defendant agrees that he is in fact guilty of those charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this Plea Agreement will be filed with the Court and become a part of the record of the case. The defendant understands and agrees that he will not be allowed to withdraw his plea should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by him in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement. The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

1.     Waiver of Indictment.

The defendant acknowledges that under the United States Constitution he is entitled to be

indicted by a grand jury on the charges to which he is pleading guilty and that pursuant to Fed. R. Crim. P. 7(b) he agrees to waive any and all rights he has to being prosecuted by way of Indictment to the charges set forth in the Information. The defendant agrees that at a time set by the Court, he will sign a written waiver of prosecution by Indictment and consent to proceed by Information rather than by Indictment.

**B.   Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses. The defendant agrees that his conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by this offense, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the Plea Agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the periods through in or about September 2015 and in or about December 2018. The amount of restitution has not yet been determined but will likely be between approximately $600 million and $1 billion.

Restitution payments shall be by cashier's or certified check made payable to the Clerk of the Court.

The defendant further agrees that he will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

**C.   Fine.**

The defendant reserves the right to argue to Probation and at sentencing that he is unable to pay a fine, and that no fine should be imposed. The defendant understands that it is his burden to affirmatively prove that he is unable to pay a fine, and agrees to provide a financial statement under penalty of perjury to the Probation Officer and the government in advance of the issuance of the draft Presentence Investigation Report, along with supporting documentation. The government retains the right to oppose the waiver of a fine. If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offense.

**D.   Special Assessment.**

The defendant agrees to pay a total special assessment of $200 (comprised of $100 per count of

PLEA AGREEMENT                                          3

1   conviction) at the time of sentencing by delivering a check or money order payable to the United States
2   District Court to the United States Probation Office immediately before the sentencing hearing.  The
3   defendant understands that this Plea Agreement is voidable at the option of the government if he fails to
4   pay the assessment prior to that hearing.

5   **E.    Violation of Plea Agreement by Defendant/Withdrawal of Plea.**

6   If the defendant, cooperating or not, violates this Plea Agreement in any way, withdraws his
7   plea, or tries to withdraw his plea, this Plea Agreement is voidable at the option of the government.  If
8   the government elects to void the Agreement based on the defendant's violation, the government will no
9   longer be bound by its representations to the defendant concerning the limits on criminal prosecution
10  and sentencing as set forth herein.  A defendant violates this Plea Agreement by committing any crime
11  or providing or procuring any statement or testimony which is knowingly false, misleading, or
12  materially incomplete in any litigation or sentencing process in this case, or engages in any post-plea
13  conduct constituting obstruction of justice.  Varying from stipulated Guidelines application or
14  agreements regarding arguments as to 18, United States Code, section 3553, as set forth in this
15  Agreement, personally or through counsel, also constitutes a violation of the Plea Agreement.  The
16  government also shall have the right (1) to prosecute the defendant on any of the counts to which he
17  pleaded guilty; (2) to reinstate any counts that may be dismissed pursuant to this Plea Agreement; and
18  (3) to file any new charges that would otherwise be barred by this Plea Agreement.  The defendant shall
19  thereafter be subject to prosecution for any federal criminal violation of which the government has
20  knowledge.  The decision to pursue any or all of these options is solely in the discretion of the United
21  States Attorney's Office.

22  By signing this Plea Agreement, the defendant agrees to waive any objections, motions, and
23  defenses that the defendant might have to the government's decision.  Any prosecutions that are not
24  time-barred by the applicable statute of limitations as of the date of this Plea Agreement may be
25  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of
26  limitations between the signing of this Plea Agreement and the commencement of any such
27  prosecutions.  The defendant agrees not to raise any objections based on the passage of time with respect
28  to such counts including, but not limited to, any statutes of limitation or any objections based on the

1   Speedy Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-

2   barred as of the date of this Plea Agreement.  The determination of whether the defendant has violated

3   the Plea Agreement will be under a probable cause standard.

4        In addition, (1) all statements made by the defendant to the government or other designated law

5   enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,

6   whether before or after this Plea Agreement, shall be admissible in evidence in any criminal, civil, or

7   administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no

8   claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

9   Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

10  the defendant before or after this Plea Agreement, or any leads derived therefrom, should be suppressed.

11  By signing this Plea Agreement, the defendant waives any and all rights in the foregoing respects.

12       **F.**      **Asset Disclosure.**

13       The defendant agrees to make a full and complete disclosure of his assets and financial

14  condition, and will complete the United States Attorney's Office's "Authorization to Release

15  Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change

16  of plea, including supporting documentation.  The defendant also agrees to have the Court enter an order

17  to that effect.  The defendant understands that if he fails to complete truthfully and provide the described

18  documentation to the United States Attorney's office within the allotted time, he will be considered in

19  violation of the Agreement, and the government shall be entitled to the remedies set forth in section II.E

20  above, above.

21       **G.**      **Agreement to Cooperate.**

22       The defendant agrees to cooperate fully with the government and any other federal, state, or local

23  law enforcement agency, as directed by the government.  As used in this Plea Agreement, "cooperation"

24  requires the defendant:  (1) to respond truthfully and completely to all questions, whether in interviews,

25  in correspondence, telephone conversations, before a grand jury, or at any trial or other court

26  proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the

27  defendant's presence is requested by the government or compelled by subpoena or court order; (3) to

28  produce voluntarily any and all documents, records, or other tangible evidence requested by the

government; (4) not to participate in any criminal activity while cooperating with the government; and (5) to disclose to the government the existence and status of all money, property, or assets, of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal activities or the illegal activities of any conspirators.

### III.     THE GOVERNMENT'S OBLIGATIONS

**A.     Dismissals/Other Charges.**

The government agrees not to bring any other charges arising from the conduct outlined in the Factual Basis attached hereto as Exhibit A.  The government also agrees not to reinstate any dismissed count except if this Agreement is voided as set forth herein, or as provided in paragraphs II.E (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), III.B.3 (Reduction of Sentence for Cooperation), VI.B (Estimated Guideline Calculation), and VII.B (Waiver of Appeal and Collateral Attack) herein.

**B.     Recommendations.**

1.     Incarceration Range.

The government will recommend that the defendant be sentenced to the low end of the applicable guideline range as determined by the Court at sentencing.

2.     Acceptance of Responsibility.

The government will recommend a two-level reduction (if the offense level is less than 16) or a three-level reduction (if the offense level reaches 16) in the computation of his offense level if the defendant clearly demonstrates acceptance of responsibility for his conduct as defined in U.S.S.G. § 3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the preparation of the pre-sentence report or during the sentencing proceeding.

3.     Reduction of Sentence for Cooperation.

The government agrees to recommend at the time of sentencing that the defendant's sentence of imprisonment be reduced by up to 50% of the applicable guideline sentence if he provides substantial assistance to the government, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that he must comply with paragraphs II.G and not violate this Plea Agreement as set forth in paragraph II.E herein.

The defendant understands that it is within the sole and exclusive discretion of the government to determine whether the defendant has provided substantial assistance.

The defendant understands that the government may recommend a reduction in his sentence of less than 50% or no reduction at all; depending upon the level of assistance the government determines that the defendant has provided.

The defendant further understands that a motion pursuant to U.S.S.G. § 5K1.1 is only a recommendation and is not binding on the Court, that this Plea Agreement confers no right upon the defendant to require that the government make a § 5K1.1 motion, and that this Plea Agreement confers no remedy upon the defendant in the event that the government declines to make a § 5K1.1 motion.  In particular, the defendant agrees not to try to file a motion to withdraw his guilty plea based on the fact that the government decides not to recommend a sentence reduction or recommends a sentence reduction less than the defendant thinks is appropriate.

If the government determines that the defendant has provided further cooperation within one year following sentencing, the government may move for a further reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

**C.      Use of Information for Sentencing.**

The government is free to provide full and accurate information to the Court and Probation, including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate statements or arguments by the defendant, his attorney, Probation, or the Court.  The defendant also understands and agrees that nothing in this Plea Agreement bars the government from defending on appeal or collateral review any sentence that the Court may impose.

**IV.      ELEMENTS OF THE OFFENSE**

At a trial, the government would have to prove beyond a reasonable doubt the following elements of the offense to which the defendant is pleading guilty.

**1.      18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States (Count One).**

Although *not* elements of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371, the elements of the underlying criminal offense (Wire Fraud, in violation

of 18 U.S.C. § 1343) are:

a.  The defendant knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

b.  The statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

c.  The defendant acted with the intent to defraud; that is, the intent to deceive or cheat; and

d.  The defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

Thus, to convict the defendant at trial on the charge of Conspiracy to Commit an Offense Against the United States, in violation of 18 U.S.C. § 371 (Count One), the government would have to prove beyond a reasonable doubt that:

a.  Beginning at least as early as in or about March 2011, and ending in or about December 2018, there was an agreement between two or more people to commit wire fraud as charged in the Information;

b.  Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

c.  One of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

**2.  18 U.S.C. §§ 2 and 1957(a)—Aiding and Abetting Money Laundering (Count Two).**

To convict the defendant at trial on the charge of Aiding and Abetting Money Laundering, in violation of 18 U.S.C. §§ 2 and 1957(a), the government would have to prove beyond a reasonable doubt that:

a.  Money Laundering in violation of 18 U.S.C. § 1957(a) was committed by someone;

b.  The defendant knowingly and intentionally aided, counseled, commanded, induced or procured that person to commit each element of Money Laundering in violation of 18 U.S.C. § 1957; and

c.  The defendant acted before the crime was completed.

///

///

PLEA AGREEMENT                                          8

The elements of Money Laundering, in violation of 18 U.S.C. § 1957(a) are:

a.     The defendant knowingly engaged or attempted to engage in a monetary transaction;

b.     The defendant knew the transaction involved criminally derived property;

c.     The property had a value greater than $10,000;

d.     The property was, in fact, derived from wire fraud, in violation of 18 U.S.C. § 1343; and

e.     The transaction occurred in the United States.

The defendant fully understands the nature and elements of the crimes charged in the Information to which he is pleading guilty, together with the possible defenses thereto, and has discussed them with his attorney.

## V.     MAXIMUM SENTENCE

### A.     Maximum Penalties.

### 1.     18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States (Count One).

The maximum sentence that the Court can impose on Count One is 5 years of incarceration, a fine of $250,000, a 3-year period of supervised release and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

### 2.     18 U.S.C. §§ 2 and 1957(a)—Aiding and Abetting Money Laundering (Count Two).

The maximum sentence that the Court can impose on Count Two is 10 years of incarceration, a fine of $250,000 or twice the value of the property involved in the transaction, a 3-year period of supervised release, and a special assessment of $100. By signing this Plea Agreement, the defendant also agrees that the Court can order the payment of restitution for the full loss caused by the defendant's wrongful conduct. The defendant agrees that the restitution order is not restricted to the amounts alleged in the specific count to which he is pleading guilty. The defendant further agrees, as noted above, that

he will not attempt to discharge in any present or future bankruptcy proceeding any restitution imposed by the Court.

**B.   Violations of Supervised Release.**

The defendant understands that if he violates a condition of supervised release at any time during the term of supervised release, the Court may revoke the term of supervised release imposed on Count One and Count Two and require the defendant to serve up to 3 additional years imprisonment.

**VI.   SENTENCING DETERMINATION**

**A.   Statutory Authority.**

The defendant understands that the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant understands that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence.  The defendant further understands that the Court will consider whether there is a basis for departure from the guideline sentencing range (either above or below the guideline sentencing range) because there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further understands that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

**B.   Stipulations Affecting Guideline Calculation.**

The government and the defendant agree that there is no material dispute as to the following sentencing guidelines variables and therefore stipulate to the following:

**(i)   Count One: 18 U.S.C. § 371—Conspiracy to Commit an Offense Against the United States.**

**1.   Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **6**.  See U.S.S.G. §§ 2X1.1(a); 2B1.1(a)(2).

**2.   Specific Offense Characteristics:**

  a.   Thirty levels are added **(+30)** because the loss attributable to the defendant during the time period of his knowing involvement in the conspiracy and within the scope of his knowing involvement exceeded $550,000,000.  U.S.S.G. § 2B1.1(b)(1)(P).

b. Two levels are added **(+2)** because the offense involved 10 or more victims.  Id. at (b)(2)(A).

c. No three level reduction, under U.S.S.G. § 2X1.1(b)(2), is required because the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense.

**3.  Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **38**.

### (ii)  Count Two: 18 U.S.C. § § 2 and 1957(a)—Aiding and Abetting Money Laundering.

**1.  Base Offense Level**: The base offense level for the charges to which the defendant is pleading guilty is **6**.  See U.S.S.G. §§ 2X2.1, 2S1.1(a)(1) and 2B1.1(a)(2).

**2.  Specific Offense Characteristics:**

a. Thirty levels are added **(+30)** because the loss attributable to the defendant during the time period of his knowing involvement in the scheme and within the scope of his knowing involvement exceeded $550,000,000.  U.S.S.G. § 2B1.1(b)(1)(P).

b. Two levels are added **(+2)** because the offense involved 10 or more victims.  Id. at (b)(2)(A).

c. One level is added **(+1)** because the defendant was convicted under 18 U.S.C. § 1957.  U.S.S.G. § 2S1.1(b)(2)(A).

**3.  Preliminary Offense Level:** The parties anticipate that the preliminary offense level will be **39**.

**1.  Grouping Multiple Counts:**

a. The Counts in the Information to which the defendant is pleading guilty may be grouped together under U.S.S.G. § 3D1.2(d).

b. The offense level applicable to the grouped Counts is 39, which is the offense level corresponding to the aggregate quantity of loss, determined in accordance with Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines.  See U.S.S.G. § 3D1.3(b).

c. Three levels are subtracted **(-3)** if the defendant pleads guilty, accepts responsibility for his offense, and the Specific Offense Level is above 16.  U.S.S.G. § 3E1.1; see also Part III.B.2 above.

**2.  Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the adjusted offense level will be **36**.

**3. Criminal History:** The parties agree and stipulate that the applicable criminal history will be determined by the Court's probation officers. The parties estimate but do not stipulate that the defendant's criminal history category will be I, and that the Guidelines sentencing range will be no less than **188 to 235**, subject, however, to the maximum statutory sentence possible for the offenses of conviction. The defendant understands that if his criminal history category differs from the parties' estimate, his Guidelines sentencing range may differ from that set forth here.

### C.   Departures or Other Enhancements or Reductions.

The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's cooperation (§5K1.1) or post-plea obstruction of justice (§3C1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The defendant also agrees that the application of the United States Sentencing Guidelines to his case results in a reasonable sentence and that the defendant will not request that the Court apply the sentencing factors under 18 U.S.C. § 3553 to arrive at a different sentence than that called for under the Sentencing Guidelines' advisory guideline range as determined by the Court. The defendant acknowledges that if the defendant requests or suggests in any manner a different sentence than what is called for under the advisory guideline range as determined by the Court, that will be considered a violation of the Plea Agreement. The government's remedies and remaining obligations in this Agreement shall be as outlined in paragraph II.E, above.

Notwithstanding the above, at sentencing, the defendant may argue, under 18 U.S.C. § 3553(a) and U.S.S.G. § 5G1.2 only, in support of the imposition of concurrent sentences on Counts One and Two. That is, the defendant agrees not to argue that the total punishment required under U.S.S.G. § 5G1.2, is less than 120 months, before application of any reduction recommended by the government pursuant to any motion under U.S.S.G. § 5K1.1. At sentencing, the defendant will not challenge the loss amount in the Guidelines calculation in this Agreement. However, the parties agree that, in support of

1    his argument that the total punishment under U.S.S.G. § 5G1.2 is no more than 120 months, the

2    defendant may ask the Court to consider his lack of actual knowledge of the full scope of loss resulting

3    from the conspiracy.  The government may oppose that and the defendant's other arguments, and argue

4    that the total punishment required under U.S.S.G. § 5G1.2 is 180 months, before application of any

5    reduction recommended by the government pursuant to any motion under U.S.S.G. § 5K1.1.

## VII.    WAIVERS

### A.    Waiver of Constitutional Rights.

8    The defendant understands that by pleading guilty he is waiving the following constitutional

9    rights:  (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to

10   be assisted at trial by an attorney, who would be appointed if necessary; (d) to pursue any affirmative

11   defenses, Fourth Amendment or Fifth Amendment claims, constitutional challenges to the statutes of

12   conviction, and other pretrial motions that have been filed or could be filed; (e) to subpoena witnesses to

13   testify on his behalf; (f) to confront and cross-examine witnesses against him; and (g) not to be

14   compelled to incriminate himself.

### B.    Waiver of Appeal and Collateral Attack.

16   The defendant understands that the law gives the defendant a right to appeal his guilty plea,

17   conviction, and sentence.  The defendant agrees as part of his plea, however, to give up the right to

18   appeal the guilty plea, conviction, and the sentence imposed in this case as long as the sentence does not

19   exceed the statutory maximum for the offenses to which he is pleading guilty (15 years), including if the

20   Court imposes consecutive terms on Counts One and Two.  The defendant understands that this waiver

21   includes, but is not limited to, any and all constitutional and/or legal challenges to the defendant's

22   conviction and guilty plea, including arguments that the statutes to which the defendant is pleading

23   guilty are unconstitutional, and any and all claims that the statement of facts attached to this Agreement

24   is insufficient to support the defendant's plea of guilty.  The defendant specifically gives up the right to

25   appeal any order of restitution the Court may impose.

26   Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if

27   one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the

28   statutory maximum for all Counts; and/or (2) the government appeals the sentence in the case.  The

1  defendant understands that these circumstances occur infrequently and that in almost all cases this

2  Agreement constitutes a complete waiver of all appellate rights.

3       In addition, regardless of the sentence the defendant receives, the defendant also gives up any

4  right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any

5  aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

6       Notwithstanding the government's agreements in paragraph III.A above, if the defendant ever

7  attempts to vacate his plea, dismiss the underlying charges, or modify or set aside his sentence on any of

8  the counts to which he is pleading guilty, the government shall have the rights set forth in Section II.E

9  herein.

10      **C.**   **Waiver of Attorneys' Fees and Costs.**

11       The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

12  119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

13  investigation and prosecution of all charges in the above-captioned matter and of any related allegations

14  (including without limitation any charges to be dismissed pursuant to this Plea Agreement and any

15  charges previously dismissed).

16      **D.**   **Impact of Plea on Defendant's Immigration Status.**

17       The defendant recognizes that pleading guilty may have consequences with respect to his

18  immigration status if he is not a citizen of the United States.  Under federal law, a broad range of crimes

19  are removable offenses, including offenses to which the defendant is pleading guilty.  The defendant and

20  his counsel have discussed the fact that the charges to which the defendant is pleading guilty is an

21  aggravated felony, or a crime that is likely to be determined to be an aggravated felony under 8 U.S.C. §

22  1101(a)(43), and that while there may be arguments that the defendant can raise in immigration

23  proceedings to avoid or delay removal, it is virtually certain that the defendant will be removed.

24  Removal and other immigration consequences are the subject of a separate proceeding, however, and the

25  defendant understands that no one, including his attorney or the district court, can predict to a certainty

26  the effect of his conviction on his immigration status.  The defendant nevertheless affirms that he wants

27  to plead guilty regardless of any immigration consequences that his plea may entail, even if the

28  consequence is his automatic removal from the United States.

## VIII.   **ENTIRE PLEA AGREEMENT**

Other than this Plea Agreement, no agreement, understanding, promise, or condition between the government and the defendant exists, nor will such agreement, understanding, promise, or condition exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and counsel for the United States.

## IX.   **APPROVALS AND SIGNATURES**

### A.   **Defense Counsel.**

I have read this Plea Agreement and have discussed it fully with my client.  The Plea Agreement accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to plead guilty as set forth in this Plea Agreement.

Dated:

_____
ROBERT WILSON
Attorney for Defendant

### B.   **Defendant:**

I have read this Plea Agreement and carefully reviewed every part of it with my attorney.  I understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my case.  No other promises or inducements have been made to me, other than those contained in this Plea Agreement.  In addition, no one has threatened or forced me in any way to enter into this Plea Agreement.  Finally, I am satisfied with the representation of my attorney in this case.

Dated:

_____
RYAN GUIDRY
Defendant

### C.   **Attorney for United States:**

I accept and agree to this Plea Agreement on behalf of the government.

Dated:

_____
McGREGOR W. SCOTT
United States Attorney


_____
ANDRÉ M. ESPINOSA
Assistant United States Attorney

EXHIBIT "A"
Factual Basis for Plea

## I.    **Background**

### A.    **The conspirators operate a $2.5 billion Ponzi scheme causing $1 billion in loss.**

From December 2009 through January 2019, Individual 1 and Individual 2, husband and wife, owned and operated two closely related business entities, Company S and Company D (collectively "the Company"). During nearly all of that period, the Company operated a Ponzi scheme that defrauded investors of approximately $1 billion through material misrepresentations and omissions related to the offer and sale of investments designed to generate profit and trigger significant tax benefits for investors. Between approximately 2016 and February 2019, the headquarters for the Company was located in Benicia, California, in the Eastern District of California. Defendant, Ryan Guidry began working at the Company in approximately 2012. After a few years, Guidry was promoted to Director of Operations for the Company. His title later changed to Vice President of Operations.

### B.    **The Company sells MSGs to generate profit and to trigger tax benefits.**

Directly and through subcontractors, the Company built mobile solar generators ("MSGs"), consisting primarily of solar panels placed on a wheeled-trailer. Company D purported to lease those MSGs to third parties, including negotiating lease agreements and collecting payments. Individual 1 and others acting at his direction touted the versatility of MSGs, and claimed there was a substantial market demand for MSGs.

The Company, through Individual 1, his co-conspirators, and others acting at their direction, solicited money from investors to purchase MSGs. A primary claim made to investors was that the purchase of MSGs carried favorable tax consequences in addition to a profit stream. The tax benefits included tax credits available for investment in alternative energy sources that permitted purchasers to claim tax credits of up to 30% of the total investment, and permitted deductions for the depreciation of MSGs over a 5-year period. These tax benefits were significant.

The Company structured transactions with investors to maximize the tax benefits. Among other deals, the Company sold MSGs to limited liability companies created specifically for such transactions.

These companies were investment funds, sometimes called tax-equity funds, permitted under the federal tax code ("Funds").

### C.   Transaction financing structure and the materiality of promised lease revenue.

Through the Funds, investors purchased MSGs from Company S for $150,000 per MSG. Typically, investors paid approximately $45,000 per MSG in cash—approximately 30% of the overall unit price—and financed the balance with Company S. The $45,000-per-unit price was the maximum amount of the tax credit investors could claim per unit. The transactions were structured so investors could immediately claim a dollar-for-dollar tax credit for the total they paid in cash to Company S, per MSG. Investors could also claim depreciation for each MSG, for five years. To complete the transactions, the Funds delivered promissory notes to pay Company S the remaining approximately 70% of the sales prices over time. The Company promised to pay off the investors' note obligations with revenues generated by the lease of MSGs by Company D to third parties.

Pursuant to offers pitched to investors by Individual 1, his co-conspirators, and others acting at their direction, the Funds leased the MSGs purchased in each transaction to Company D, which purported to lease the MSGs to third parties. Company D was supposed to receive money from those third parties through lease payments. After deducting certain fees, Company D was to transfer the majority of the lease revenue to accounts for the Funds. The manager of the investment funds was to use the lease revenue sent by Company D to pay the periodic obligations on the notes held by Company S, with a small monthly profit paid to investors.[1]

The purported lease revenue from third parties was a material component of the transactions. First, that projected lease revenue was a factor in valuing the MSGs at $150,000 per unit. Second, the lease revenue was the mechanism for the Funds to pay the remaining approximately 70% of the purchase price for the MSGs. Based on sales pitches by Individual 1, his co-conspirators, and others acting at his direction, investors were primarily interested in the tax benefits offered through each

---

[1] The Company also closed a variant of these tax-equity transactions that did not include financing through Company S. Rather, in those sale-leaseback transactions, investors purchased MSGs outright, or relied on outside financing. In other material respects, the transactions mirrored the primary tax-equity transactions, including the management of third-party lease contracts by Company D, availability of post-transaction tax benefits, and a profit stream. Instead of using third-party lease revenue to pay a note obligation to Company S, the purported revenue was paid to the investor.

PLEA AGREEMENT                                          A-2

transaction and not actual ownership of the MSGs. However, because the tax credits were capped at 30% of the value of the overall transaction, paying anything more than 30% of that value would diminish the tax benefits—*i.e.*, the investors would pay more than the value of the tax credits. By paying off the 70% balance of the purchase price through revenue generated by leases Company D promised to generate from third parties, investors maximized the tax benefits without incurring more debt or cost. Failure of that mechanism after investors executed transactions would result in default on the notes, collapse of the transactions, and failure of the tax credits.

**D.   Purportedly independent certification of the construction and operation of MSGs.**

Because the Company promised to lease MSGs associated with each transaction to third parties—through Company D—with little direct participation from the Funds or investors, the Funds and investors did not take physical possession of those MSGs. Rather, the Company represented to the Funds and investors that it built MSGs for each transaction and those MSGs operated in a manner consistent with regulations governing application of the tax credits the investors sought. The Company made those representations through written Commissioning Reports, purportedly prepared by an independent engineer after a multi-point inspection of each MSG in each transaction. Individual 1, his co-conspirators, and others acting at their direction caused those Commissioning Reports to include materially false information and to be delivered to investors. In some instances, investors required completed Commissioning Reports as conditions for payment to support the transactions. In other instances, Individual 1 and his co-conspirators delivered the Commissioning Reports after payment to lull investors to believe their MSGs existed and operated as required under the terms of the transactions.

**E.   Approximate investments and tax benefit totals associated with the transactions.**

Between March 2011 and December 18, 2019, at least twelve investors entered into transactions with the Company through approximately thirty-four Funds. Some investors invested through more than one Fund. The investors, through the Funds, collectively deposited by interstate wire transfer approximately $759,000,000 into bank accounts for the Funds established for the transactions. Further, several financial institutions and other investors transferred collectively $136,000,000 to the Company as part of related transactions for the purchase and lease of MSGs. In total, the Company closed

1    transactions with Funds and others involving approximately 17,000 MSGs, at approximately $2.5 billion
2    in purported value.

3         Many investors have claimed tax credits and depreciation in connection with the transactions
4    premised on the revenue allegedly being earned by Company D's leases of the MSGs to third parties.
5    The tax value of the tax credits and depreciation claimed by the Funds, up to and including the 2017 tax
6    year, is approximately $902,000,000.  This figure does not account for approximately $167,000,000 that
7    investors paid into tax equity transactions in 2018.

8         **F.**    **Operation of the "flip" deals that followed the tax equity transactions.**

9         The Company structured nearly all of the tax-equity transaction so the investors owned 99% of
10   the associated Fund and the fund manager owned 1% of the Fund.  After five years, the ownership
11   structure flipped, with the fund manager owning 95% of the Fund and the investors owning 5%.  After
12   five years, investors had the option of selling their 5% ownership interest in the Fund to the fund
13   manager, and divesting their ownership interest in the MSGs.  This appealed to many investors because,
14   after five years, they could extract no further tax benefit from ownership of the MSGs.

15        At the end of a five-year term of a tax-equity transaction, the Company would arrange to sell
16   certain existing MSGs from those transactions to buyers in "flip" deals.  In one such transaction,
17   Individual 1, his co-conspirators, and others acting at their direction brokered a "flip" deal with A-Group
18   and K Bank.  As part of that transaction, K Bank provided $27 million to A Group, a private equity
19   group, to finance the purchase of approximately 416 MSGs that were owned by two Funds through
20   earlier tax-equity transactions.  The $27 million from K Bank represented approximately 80% of the
21   overall transaction.  A Group investors contributed the balance of the purchase price.  The deal was
22   completed through a special purpose entity called S-Sense.

23        Individual 1, his conspirators, and others acting at their direction represented to A Group and K
24   Bank that the 416 MSGs were leased to Telecom Company A as part of an approximately 10-year fixed
25   amount contract between Telecom Company A and Company D.  After the sale, S-Sense leased the
26   MSGs back to Company D to continue leasing them to Telecom Company A as part of the purported
27   existing contract between them.  Thereafter, the Company assigned purported lease revenue generated
28   by that lease with Telecom Company A to S-Sense as a revenue and profit stream.

**G.     The Company's tax equity transactions were fraudulent.**

Bank records, witness interviews, and other evidence, revealed that Individual 1 and his co-conspirators knowingly misrepresented the existence of lease revenue from third parties—an integral component in all of the Company's transactions—and caused others to unwittingly do so.  In particular, the conspirators claimed Company D generated tens of millions of dollars in lease revenue from third parties, from long-term and short-term agreements with those third parties.

In truth, Individual 1 and his co-conspirators operated the Company as a massive Ponzi scheme.  Over 90% of the money Company D claimed as lease revenue and which it used to pay the Funds' note obligations and other payments to investors was actually derived from transfers of cash contributed to Company S by later investors in tax-equity and other transactions.  Company S had nearly no other significant sources of revenue.  Company S was the primary source of income for Company D, providing no less than approximately 94% of all of the purported revenue Company D claimed.  Thus, the Company merely paid obligations due to older investors with money raised from those investors and later investors—contrary to representations to investors made by Individual 1, his co-conspirators, and those acting at their direction, that third-party lease revenue would pay those obligations.  Certain of Company D's existing third-party lease agreements were supported with separate side-agreements pursuant to which Company S paid investor money to third parties, which the third parties returned in the form of lease revenue.  The conspirators concealed the absence of third-party lease revenue from investors through, among other means, false financial statements they knowingly shared with investors.

**H.     The A Group/K Bank "flip" deal transaction was fraudulent.**

The A Group/K Bank "flip" was also a fraud.  Contrary to representation made by Individual 1, his co-conspirators, and others acting at their direction, the purported fixed-term lease between Telecom Company A and Company D that supported the transaction was false.  Rather, certain as-needed leases with Telecom Company A generated only a fraction of the millions in annual revenue Individual 1 and his co-conspirators claimed supported the A Group/K Bank deal.  The overwhelming majority of that purported revenue derived from intercompany transfers of tax-equity investor money from Company S to Company D.  In support of the transaction, and in furtherance of the fraud, the conspirators knowingly caused a fraudulent estoppel agreement to be delivered to A Group/K Bank in support of the transaction,

which purported to assign lease revenue to A Group/K Bank, when that lease agreement and the purported revenue associated with it did not exist.

**I.      The December 2018 searches and asset seizures, the Company's bankruptcy, and the MSG audit by investor-victims.**

In December 2018, law enforcement agents executed search warrants at the Company's headquarters and elsewhere. Agents also executed over 150 asset seizure warrants, resulting the seizure of approximately $60,000,000 in assets derived from the fraud. During execution of those warrants, agents found approximately $1.7 million in cash in Individual 1's office safe and over $150,000 in cash in other locations throughout the office suite. Inside the chief financial executive's office, agents found an investor presentation and marketing documents, as well as internal financials for Company D's performance in November 2018 and December 2018. Agents also interviewed employees, at least one of whom provided information about the Company's structure and evidence of the ongoing fraud.

Following execution of those warrants, the Company entered bankruptcy in or about February 2019. Thereafter, certain investor-victims financed an independent audit of the existence and location of all MSGs based on information that the Company had not built the total number of MSGs it represented to investors were part of the tax-equity transactions. The audit produced evidence of the existence of approximately only 6,000 MSGs from approximately 17,000 MSGs associated with sales to Funds in approximately thirty-four tax-equity transactions. Among others, none of the approximately 2,280 MSGs associated with Fund 29, involving over $100,000,000 in cash paid by an investor in or about May 2017, were located in the investor-victim audit. Additionally, only approximately eighty-three of the 2,279 MSGs associated with Fund 33, involving more than $90,000,000 in cash paid by the same investor in or about July 2018, were located in the investor-victim audit.

**II.      Facts Describing Defendant's Involvement in the Scheme**

**A.      Guidry joined the conspirators' existing conspiracy to defraud investors.**

Defendant Ryan Guidry ("Guidry") knowingly joined the conspiracy to defraud the Company's investors and furthered it by overt acts to mislead investors about material facts. Among other things, at the direction of Individual 1, Guidry (a) obtained unauthorized signatures on false contracts Individual 1 used to induce investments by investor-victims; (b) delivered and caused to be delivered false location

A-6

and other information about MSGs to help induce investors to close transactions; and (c) helped conceal from investors the fact that the Company had not built MSGs associated with certain transactions by arranging for inspections where VIN number stickers identifying MSGs from other transactions were replaced with VIN number stickers assigned to the MSGs under inspection.  Guidry understood the Company's business model and knew that Company D was not earning sufficient lease revenue to pay its obligations to the Funds.  Although Guidry did not have direct knowledge of the specific amounts of those obligations, Guidry knew that the Company could only stay afloat if it closed new transactions with fresh investments to pay off obligations from old transactions, and discussed that fact with Individual 1, Individual 2, Individual 3, Robert Karmann, Ronald Roach, and others.

### A.     Individual 1 pays $2 million to Guidry and Individual 6 to obtain a signature on a false lease contract that Individual 1 later used to induce investments from victims.

In or about September 2015, Individual 1 asked Guidry to obtain a signature on a contract obligating Telecom Company A to lease 1,000 MSGs from the Company for approximately $1,100 per month each, for a period of at least 10 years (the "2015 Telecom Company A Lease").  Individual 1 offered Guidry $1,000,000 to get the 2015 Telecom Company A Lease signed, and also offered to pay $1,000,000 to whoever signed it.  Guidry met with Individual 6, a then-employee of Telecom Company A, who agreed to sign the contract.  Shortly after Individual 6 signed the 2015 Telecom Company A Lease, Individual 1 hired Individual 6 to work at the Company.  Later, Individual 1 told Guidry that Individual 1 was presenting the 2015 Telecom Company A Lease to prospective investors to induce them to invest in transactions with the Company.

Guidry learned Individual 1 was deceiving investors.  Initially, Individual 1 had described the 2015 Telecom Company A Lease to Guidry as an "as needed" lease that did not obligate Telecom Company A to pay fixed rent through the duration of the agreement.  However, Guidry later learned the opposite was true, and that Individual 1 was pitching the 2015 Telecom Company A Lease to investors in that manner.  Guidry and Individual 6 spoke about that fact and how Individual 1 was using the 2015 Telecom Company A Lease to close other investment deals.  Individual 6 was angry that Individual 1 did not pay Individual 6 more as a result of investment transactions that closed in reliance on the 2015 Telecom Company A Lease.  Guidry and Robert Karmann discussed the fact that Individual 1 was

delivering false information to investors. They discussed sending Individual 1 whatever he wanted, regardless of the truth. They agreed that as long as they did not send "garbage" to investors, Individual 1's conduct was not their problem.

As promised, Individual 1 paid Guidry and Individual 6 each $1,000,000. Individual 1 paid Guidry through a series of three interstate wire transfer payments (a) $500,000 on May 23, 2016, into an account Guidry set up in the name of a company Guidry created; (b) $350,000 on August 22, 2017, into the account of PI LLC, a Florida company owned by Guidry's friend and into which Guidry and Individual 1 agreed to deliver the payment, disguised as consulting fees due to PI LLC; and (c) $150,000 on September 1, 2017, into PI LLC's account. Guidry knew the money from which Individual 1 paid Guidry the $1,000,000 came from payments by investors to the Company, and that Individual 1 was deceiving those investors to induce those payments, with Guidry's participation. Guidry provided Individual 1 and others with information to complete those wire transfers. In doing so, Guidry acted with the knowledge and intention to help Individual 1 commit money laundering.

**B.     Individual 1 offers to pay $20,000 to the person who signs a contract related to an earlier fraudulent lease, and Guidry and Individual 6 split the money and sign that contract in a fake name.**

Between May and July 2017, Individual 1 had discussions with Guidry about the need for an executed estoppel agreement related to the 2015 Telecom Company A Lease. The estoppel agreement assigned the right to collect millions of dollars in revenue purportedly generated by the 2015 Telecom Company A Lease to S-Sense in support of the A Group/K Bank deal with the Company. Individual 1 asked Guidry to get the estoppel agreement signed. Guidry asked Individual 6 to sign the estoppel agreement but Individual 6 declined, and said neither he nor any current or former employee of Telecom Company A would sign the agreement. Guidry reported Individual 6's refusal and explanation to Individual 1. In response, Individual 1 told Guidry Individual 1 would pay $20,000 to the person at Telecom Company A that signed the estoppel agreement. Guidry did not believe that Individual 1 cared who signed the agreement.

Guidry returned to Individual 6 and proposed that they execute the contract together and split the $20,000. Individual 6 agreed, and they executed the agreement together in the altered name of a former

1   employee of Telecom Company A, which Individual 6 provided.  On or about July 21, 2017, Guidry

2   emailed to Individual 1 the estoppel agreement with the false signature.  Later, Individual 1 paid Guidry

3   $20,000 in cash from a safe in his office, and Guidry split the money with Individual 6.  Individual 1

4   caused delivery of the false estoppel agreement to S-Sense in support of the A Group/K Bank deal.

**C.      Guidry delivers false information to investors and helps interfere with inspections of MSGs by moving MSGs to inspection sites and by replacing VIN numbers of MSGs.**

7       During the conspiracy, at the direction of Individual 1, Guidry collected and prepared false

8   information Guidry knew would be delivered to investors, and participated in efforts to conceal that

9   false information and other lies from investors.  In April 2017, Guidry compiled a false spreadsheet for

10  416 MSGs purportedly drawn from MSGs associated with two existing Funds.  Individual 1 required

11  those 416 MSGs to be located in California and Nevada.  Guidry collected a group of 416 MSGs from

12  Company records for MSGs located in California and Nevada and created a spreadsheet of those MSGs

13  after replacing the existing VIN numbers assigned to those MSGs with VIN numbers Individual 1

14  provided.  Guidry emailed a copy of the false spreadsheet to Individual 1 and to a broker who worked

15  with the Company to pitch investments to prospective clients.  Guidry knew the location report was false

16  and that the false report would be delivered to S-Sense in support of the A Group/K Bank transaction.

17      On occasions in 2017 and 2018, in Benicia and Las Vegas, Guidry worked with Individual 1,

18  Individual 7 (a Company employee and relative of Individual 1), Joe Bayliss, and others to scrape off

19  VIN number stickers from MSGs assigned to particular transactions and replace them with VIN number

20  stickers assigned to different transactions.  The effort was designed to trick investors during inspections

21  into believing that MSGs associated with the transaction under inspection existed and/or could be found

22  at the locations the Company had asserted, when the opposite was true.  In certain instances, at

23  Individual 1's direction, Guidry and others buried GPS devices purportedly associated with MSGs at

24  certain locations to make it appear that MSGs were in use at those locations when they were not.

25      In 2018, at Individual 1's direction, Guidry also helped trick inspectors associated with the A

26  Group/K Bank transaction about the location of MSGs associated with that transaction.  Specifically, in

27  response to a scheduled inspection of some of the 416 MSGs associated with that transaction, Individual

28  1 and Guidry developed a list of inspection sites and coordinated the delivery of MSGs to those sites

before and on the day of the inspection.  The effort was designed to trick the inspectors into believing those MSGs had been deployed at those sites all along, when the opposite was true.

**D.      Individual 1 asks Guidry to find his and Individual 2's passports during the FBI search of the Company offices.**

During the law enforcement search of the Company headquarters, in December 2018, Individual 1 called Guidry, who was in the Company offices.  Individual 1 asked Guidry if Individual 1's and Individual 2's passports were still on Individual 1's desk.  Guidry told Individual 1 that the passports were not on Individual 1's desk.  Individual 1 replied "Oh fuck," and terminated the call.

**E.      Guidry's conduct and that of his co-conspirators caused interstate wires.**

Guidry agrees that his conduct discussed herein, and that of his co-conspirators, caused interstate wire communications to investors and others.  Guidry also agrees his conduct and that of his co-conspirators caused interstate Fedwire deposits of money from the investor-victim in the Fund 30 transaction, P Company, based in Ohio, to bank accounts in California controlled by the Company, among others, as set forth below:

| Company Bank | Account No. | Date | Deposit Amount | Payor |
|---|---|---|---|---|
| H Bank | 5773XXX | 5/17/2017 | $15,063,692 | P Company |
| H Bank | 5773XXX | 7/20/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/24/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 8/29/2017 | $10,224,225 | P Company |
| H Bank | 5773XXX | 9/25/2017 | $10,224,225 | P Company |

*I have read and carefully reviewed the Factual Basis for Plea with my attorney.  I agree that as it concerns my conduct it is correct.  I also agree that if this matter proceeded to trial, the United States could establish each of the facts contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the offense to which I am pleading guilty.*

Dated:

_____
RYAN GUIDRY
Defendant