ROBERT M. WILSON (SBN 122731)
Law Offices of Robert M. Wilson
770 L Street, Suite 950
Sacramento, CA. 95814
Tel. (916) 441-0888
E-Mail: RWilson@BusinessCounsel.net

Attorney for Defendant
RYAN GUIDRY

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>RYAN GUIDRY<br><br>    Defendants. | )  No. 2:20 CR 00003 DAD<br>)<br>)  OBJECTIONS TO PRESENTENCE REPORT<br>)  AND SENTENCING MEMORANDUM<br>)<br>)<br>)  Sentencing: January 31, 2023<br>)<br>)<br>) |

**OBJECTIONS TO PRESENTENCE REPORT**

Defendant has no legal or factual objections to the Final Presentence Report.

**SENTENCING MEMORANDUM**

Appearing before the Court for sentencing is a first-time offender, "Ryan" Guidry, age 46, who waived indictment and pled guilty on January 13, 2020, to one count of Conspiracy 18 U.S.C. § 371 and one count of Aiding and Abetting Money Laundering, in violation of 18 U.S.C. §§ 2 and 1957(a). The gravamen of his offense is that Ryan found himself in the middle of a colossal fraud perpetrated by Carpoff, his wife, their lawyers, accountants, and other


professionals. As the government will acknowledge, Ryan has openly and candidly acknowledged what he did.

Ryan's cooperation with the Government began in the summer and fall of 2019. He was prepared to accept an offer, ultimately accepted by Bayliss, capping his exposure to five years. This was aborted when Carpoff called and made a credible threat toward Ryan and his family. The government used the threat at Carpoff's detention hearing and ultimately provided this information to the Probation Department for use in Carpoff''s PSR. The government's sentencing memorandum again brought it to the Court's attention at the time of his sentence. The government maintained that only one person was getting the five-year cap, and notwithstanding the threat to Ryan and his family, if he wanted to plead guilty, he would have to plead to two counts with exposure of 15 years with a 5K. Ryan pled guilty on January 13, 2020.

In addition to cooperating with the government, Ryan has been cooperating extensively with the Trustee in Bankruptcy. Ryan knows little about the scheme or location of assets; instead, his cooperation has focused on the legitimate side of the business as the Trustee seeks to defend claims by the sued professionals that the business was a fraud and has no standing. Ryan has had multiple meetings with counsel for the Trustee and has agreed to continue cooperating even after sentencing.

**Plea Agreement**

The plea agreement, in this case, provides that the government 'may' seek consecutive time for a maximum sentence of 15 years – or they could seek to have counts one and two would run concurrently - for a maximum sentence of 10 years. The government also has the option to seek up to a 50% 5K departure for Ryan's cooperation.

The plea agreement permits the defense to argue 3553 factors in support of concurrent time but restricts the defense from arguing 3553 factors should the court decide to run the time concurrently.  The government has already indicated that it will file a 5K motion in this matter.  The defense is not prohibited in the plea agreement from arguing that the 5K motion inadequately represents the nature and scope of the cooperation Ryan provided and has agreed to provide in the future.

### 3553 Factors for Concurrent Time
### Sentencing Considerations – 18 USC 3553

Section 3553(a) creates no order of priority among listed factors; its plain language and structure indicate that each is to be treated equally and must be considered.  These factors are:

1- "The nature and circumstances of the offense and the history and characteristics of the offender,"
2- "The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner,"
3- "The kind of sentences available,"
4- "The kinds of sentence and sentencing range established by the Sentencing Commission in the Sentencing Guidelines,"
5- "Any pertinent policy statements issued by the Sentencing Commission,"
6- "The need to avoid unwarranted sentence disparities among similarly situated defendants,"
7- "The need to provide restitution."

When presented before the Court for punishment, the factors contained in 18U.S.C.3553 (a) require the Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in that section. This defendant has certain factors which the Court should take into consideration while contemplating an appropriate sentence. They are unique to Ryan and appear to land squarely in the factors reflected in 18

U.S.C. § 3553. The Court should look for a sentence sufficient but not greater than necessary to address the sentencing factors set forth in 18U.S.C. 3553 (a).

That principle is codified at 18 U. S. C. §3661, which provides that "[n]o limitation shall be placed on the information" a sentencing court may consider "concerning the [defendant's] background, character, and conduct," and at §3553(a), which specifies that sentencing courts must consider, among other things, a defendant's "history and characteristics," §3553(a)(1).

Ryan has always accepted responsibility for his actions, and the government will agree that he was completely forthcoming and truthful during his multiple debriefings. Unlike Hansen, Ryan never lied about anything and didn't try to minimize his responsibility. But for the credible threat he received, he, not Bayliss, would have been the first to plead guilty. The government will also agree that Ryan was unaware of the overall scope of the fraud conducted by Carpoff and the professionals who aided and enabled him.

This was a sophisticated fraud. Ryan is not sophisticated. The F.B.I. referred to him as an over-employed bartender. Ryan didn't drive an expensive car, collect expensive cars, or live a lavish lifestyle. He drove a pickup truck. He's blue-collar. He coached soccer and little league. He is a family man. Ryan wasn't part of the Carpoff inner circle. Ryan's office wasn't on the second floor where Carpoff and others worked and carried out their scheme; instead, his office was in the warehouse where he oversaw the 'legitimate side' of the business. He oversaw the building and dispatching of the equipment. He fought with the Carpoffs to pay vendors so machines could be built. He was the face of the company to the vendors supplying parts, the building of machines, and customers seeking the machines. He oversaw remote locations in Southern California and Las Vegas. *He even tried to improve the tracking of the machines by*

SENTENCING MEMORANDUM **4 | P A G E** 2:20-CR 00003-DAD

*working with a software developer to develop a means to track the machines. This was ultimately rejected by Paulette Carpoff for reasons that are now obvious.*

Ryan's problem was that he we loyal to DC Solar – and Carpoff. He wanted DC Solar to continue to grow. He knew Carpoff was doing some questionable, if not illegal, business practices, but he had no idea of the nature and scope of the fraud. Ryan knew he had done some illegal things too. Ryan's conduct, in this case, helped Carpoff perpetrate his fraud, and Ryan has fully acknowledged his conduct and accepted responsibility.

Misplaced trust in others and poor decisions bring Mr. Guidry before the Court.

**Ryan Guidry – the person**

The defendant is an outstanding member of the community, involved in his children's little league and sports, as a loving and dedicated husband and father. He has a strong work history and his current employer's support.

Ryan has provided the Court with his statement attached to the PSR. As he works his way toward sentencing, he has updated and edited the letter for this Court. His letter and letters from family, friends, co-workers, and his psychiatrist and therapist are attached. Additionally, two letters from counsel for the Trustee in Bankruptcy attesting to his ongoing cooperation with the Trustee. The following information summarizes some of the pertinent information in the attached letters and will assist the Court in becoming familiar with this rather outstanding man and his family.

**Personal, Family, and Community Information:**

As set forth in her attached letter, Ryan has been married to his lovely wife, Jennifer, for almost 14 years. Together they have two young children.

*//*

### Jennifer Guidry

Ryan's wife, Jennifer, is a flight attendant who describes him as a "devoted, dutiful father who relishes the role of primary caregiver when she is out of town." As a little league coach, Ryan "assembled a team of coaches who were great teachers and positive role models." He was loved by his in-laws, and "[a]nytime they needed anything, he showed up without delay." "As he prepares for his sentencing hearing, his primary focus has been on our family's stability and wellbeing."

### Deborah Lockhart

Deborah is Ryan's mother. She speaks of his history since childhood of being a compassionate and loving person who was always looking to make other people's lives better. When she visited him in California, she "was very proud of the beautiful, unpretentious, happy life he and Jennifer built for themselves." He proudly gave her a tour of DC Solar and showed her where they assembled the units. When he moved back to Louisiana, "[h]e is doing everything possible create a peaceful new life for his children…"

### Jennifer Womble

Jennifer describes Ryan as a "hands-on dad" and close friend. She attests to his virtues as a mentor to children as a little league coach. "Ryan has a wonderful way with children and develops strong, meaningful connections with them. He worked hard to give his team a strong foundation in baseball skills and good sportsmanship." Ryan told her and her husband in person about his legal troubles. "he gave a frank assessment of the case and did not hide the seriousness of the charges."

//

//

### Lisa Lutkus

Lisa and her husband are also little league parents who sing praise for Ryan as a father and mentor. "He has a reputation as a community-oriented family man who was always there for his neighbor."

### Rich Gomez

Rich knows Ryan as a compassionate coach, extraordinary community member, and friend. He recalls the compassion Ryan showed to a young T-baller who struggled to hit the ball. "Ryan paused the game to give the kid as many swings as he needed." "Ryan's actions meant the world to that child. It lifted the kid's spirits high, and everyone celebrated with him."

### Nicole Murtha

Nicole has known Ryan since 2001 and has employed him as a bartender at her bar in the Virgin Islands. Nicole speaks highly of his work ethic but, more importantly, of his character as a human. Ryan was there when she needed a liver transplant. "Ryan was my rock throughout my illness." "On my worst days, his loving friendship meant everything to me."

### Greg Frizzie

Greg worked with Ryan at DC Solar 'as both a service provider and a customer." "Ryan is a man of great integrity." "From my point of view, DC Solar was a completely legitimate business." Ryan told Greg about his criminal problems and that he took responsibility by pleading guilty. "Despite this case, I would absolutely work with Ryan again in the future."

### Brent Reckert

Brent has known Ryan since his bartending days in the Caribbean. He later came to work with Ryan at DC Solar. Brent was eventually put in charge of the Los Angeles region warehouse, where he experienced problems with tracking machines. In 2016, Ryan was trying to

find a better way to track equipment. Tracking equipment and software solutions developed by Ryan were shot down by Paulette Carpoff and she even refused to pay the vendors. Ryan first learned of serial number tampering when he was contacted by Brent in 2017.

Brent also confirms Ryan's drug and alcohol issues and that the last two years at DC Solar, Ryan was drinking a lot heavier.

### Brett Stubbs

Brett was the Inventory Manager, reporting to Ryan. His statement recalls Ryan working on a software solution to track the inventory and that it was rejected by Paulette Carpoff, for no apparent reason. Toward the end of DC Solar, Brett noticed Ryan was drinking more and drinking during the day at work. Brett attributes the drinking to stress associated with DC Solar.

### Jeff Price

Jeff also worked with Ryan at DC Solar. With Ryan's mentoring, Jeff rose up in the company to a technician. "Ryan's faith in me was a gift I will remember for the rest of my life." Because of Ryan's mentoring, he was proud to work at DC Solar, and "[i]t was exciting to work on such a cutting-edge technology that was good for the environment." Ryan also took a personal interest in Jeff, "Ryan helped me twice when I was in serious personal distress. Both times, I called him for help and he was there. He didn't leave my side until he was sure I was okay. He also saved my job on both occasions."

### Peter Dang

Peter Dang was a neighbor of Ryan. He was also a software developer. In 2018, when Ryan again became frustrated with the lack of a meaningful way to track the equipment locations, he worked with Peter to develop a solution.   To implement the solution, they needed

the approval of Paulette Carpoff. For reasons that are readily apparent now, that approval was not forthcoming. Instead, the Carpoffs continued their massive fraud.

### Deposit of $250,000 with the Court

Ryan has been transparent with the government throughout these proceedings. Even though no financial restrictions were in place on Ryan, when he determined that the best interest of his family was to move to Louisiana, he and Jennifer sold their house. Before he did, he, through counsel, notified the government that he wanted to make a good-faith payment towards restitution. Ryan agreed to deposit $250,000.00, his portion of the community property proceeds, with the court clerk. This speaks to his understanding that restitution is required and speaks volumes as to his character.

### Deepak Rao M.D.

Ryan's mental health and alcohol dependency has suffered due to his childhood trauma and predisposition to addiction. Recognizing his problem, Ryan sought help. He sought psychiatric assistance from Dr. Roa for depression, anxiety, and substance-related issues. For more than two years, he attended monthly meetings with Dr. Roa. Dr. Roa concluded that during the time he was at DC Solar, he was going through "undiagnosed depressions and anxiety, which he was self-medication with alcohol and other substances, and this may have impaired his judgment."

While it is not an excuse for his lack of judgment, his drug and alcohol self-medication is a realistic explanation for his aberrant behavior.

### Nyla Gutekunst M.A., LPC

When Ryan moved to Louisiana, Ryan continued his meetings with Dr. Roa via Zoom until the end of 2022. At that time, he began local treatment and counseling with Nyla

Gutekunst M.A., LPC, his therapist.   He continues to work on implementing strategies and tools to help reduce stressors that contribute to his anxiety and depression.  He is using these tools instead of turning to alcohol as a form of coping.

**Jordan Johnson**

Jordan works with Ryan at Aramark in Louisiana.  Jordan describes Ryan as a man who "builds strong relationships and earns peoples trust, consistency, straight-forwardness, and personal warmth."  "Ryan has nurtured and mentored [Jordan] out of the kindness of his heart. ….[H]is children are at the forefront of everything he does.  Ryan is a truly fine gentlemen in a world where this is rare."

**Jay Naron**

Jay is Ryan's supervisor at Aramark in Louisiana.  He hired Ryan following a strong reference from his counterpart in California, who said, "You want this guy on your team." He credits Ryan with increasing sales through motivation and mentoring other company representatives. He describes Ryan as "respectful, funny, honest, and honorable."  "Ryan will always have a job on my team.  He is an ideal employee, talented leader, and exceptional team player."

For all the foregoing reasons, there are ample 3553 grounds for this court to run the time concurrently for a maximum of 120 months before considering the 5K motion filed by the government.

//
//
//
//
//
//
//
//

### 5K Considerations
### The Government Fails to Acknowledge Ryan's Nature, Scope, And the Benefits the Government and Victims Have Received Through Ryan's Cooperation.

### The Telecom Contract

Ryan knows little details about the scheme Carpoff was perpetrating. The government acknowledges that what he did provide was truthful and complete. Key to his debriefing was how a contract was obtained for a supposed fixed rate lease of 416 MSG's for ten years. Unlike Hansen, who lied, Ryan acknowledged his involvement and further acknowledged that he was paid 1 million dollars for obtaining a fraudulent signature on the contract. Ryan also provided the government with confirmation that Hansen lied about getting 1 million dollars as well, thus derailing ongoing plea negotiations with Hansen. Mr. Hansen's decision to lie effectively made him useless as a witness should Carpoff have chosen to go to trial. Yet he still received the benefits of a 5K. Carpoff's decision to plead guilty to a 30-year sentence was partly due to Guidry's truthfulness and willingness to testify at trial.

### MSG location deception

In addition to confirming the participation of Bayliss and Hansen in the scheme to deceive investors as to the location of MSG's, Guidry provided the names of other unindicted parties who actively participated in the deception. The fact that the government chose not to indict these individuals should not be held against him.

### VIN Sticker Swapping

In addition to confirming the participation of Bayliss and Carpoff in the scheme to deceive investors, Guidry provided the names of other unindicted parties who actively participated in the deception. The fact that the government chose not to indict these individuals should not be held against him.

**$250,000 Deposit with the Court**

Ryan has cooperated with the government by voluntarily depositing $250,000 with the Clerk of the Court. The deposit is intended to go towards restitution and represents Ryan's community property interest in the sales proceeds of his residence. This voluntary contribution was made without the government having to institute a forfeiture action or lien upon the house. Nothing prevented Ryan and his wife from selling their home and moving to Louisiana. Counsel for Mr. Guidry contacted the government and notified them of the pending sale and sought assistance from the government in facilitating the deposit of the funds with the Clerk of the Court. This cooperation cannot go unacknowledged.

**The Threat Made by Carpoff**

As part of his initial debriefing, Ryan explained to the government why he suddenly became reluctant to cooperate. He explained the facts and circumstances surrounding Carpoff's threat toward him and his family. The government found the threat to be credible and used this information at Carpoff's detention hearing, provided it to the Probation Department for use in the PSR, and again brought it up at Carpoff's sentencing hearing before Judge Mendez.

**Bankruptcy Trustee Cooperation**

The government is not the only entity seeking to recover assets and damages for the conduct of those responsible for the losses sustained by virtue of Carpoff's scheme. As outlined in the attached letters from the Meland | Budwick firm, the Trustee in Bankruptcy has the responsibility to maximize the distribution to the creditors of DC Solar through investigation and civil litigation claims against third parties. Among the third parties recovery is being sought are the professionals who assisted in the perpetration of the fraud by providing legal services and opinion letters, auditing services, and accounting services. Without these professionals, this

fraud would never have been possible. Investors relied on these professionals to legitimize what Carpoff was doing. Having been removed from state court and transferred from the Central District, among the cases that are now pending before this Court is - Solarmore Mgt. Services, Inc., et al. v. Nixon Peabody, LLP et al. 2:20-cv-02446-DAD-DB. According to the complaint in that matter, Nixon Peabody LLP helped the founder of solar generator company DC Solar operate a "massive" $1 billion Ponzi scheme even in the face of obvious clues the firm should have seen and acted on, according to a lawsuit brought by the now bankrupt company's trustee.

The firm and partner Forrest David Milder played a "vital role" in the scam, creating and implementing the complex, tax-advantaged renewable energy investments at its center despite having reason to suspect DC Solar's founder was lying to investors and paying early investors with money taken from later ones, according to the complaint filed Monday in Nevada federal bankruptcy court.

"Nixon saw clear and repeated red flags, from which Nixon knew or should have known that [DC Solar founder Jeff] Carpoff was engaged in wrongdoing and harming [DC Solar] in connection with the transactions that Nixon structured, oversaw, marketed, and closed," the complaint said.

The fraud that Nixon Peabody helped Carpoff perpetrate cost DC Solar hundreds of millions of dollars, according to its bankruptcy trustee, Christina Lovato.

"Nixon Peabody could easily have stopped Jeff Carpoff's Ponzi scheme in its tracks. Instead, Nixon Peabody chose to join and profit from the Ponzi," said Michael Budwick, a partner and co-chair of the financial frauds group at Meland Budwick PA who represents Lovato. "Nixon Peabody took millions of dollars in fees to close hundreds of millions of dollars in transactions that Nixon knew would injure DC Solar and cheat the United States of America."

SENTENCING MEMORANDUM          13 | P A G E          2:20-CR 00003-DAD

In defending against any collateral attack by the Trustee, these professionals, and their insurance companies, will challenge the legitimacy of DC Solar, claiming the company was a fraud and had no legitimate business operation. As a fraudulent company, the professional will claim that DC Solar has no standing to pursue litigation.

To counter this argument, it is paramount for the Trustee to demonstrate the legitimacy of DC Solar. Ryan is integral in doing this. He oversaw the 'legitimate' side of DC Solar and has provided "substantial cooperation" in the following areas:

1. DC Solar's internal operations, such as between and among its employees, and different employees' roles.
2. The mobile solar generators, of which the DC Solar bankruptcy estate owns an interest.
3. DC Solar's external operations, such as between DC Solar and/or its employees and third parties.

In addition to the more than five (5) debriefing sessions he had with counsel for the Trustee, Ryan has agreed to continue his cooperation after sentencing and has agreed to fly to Florida on February 9th for a further debriefing.

Assisting the Trustee in bankruptcy cannot go unacknowledged. As an after-the-fact appointed fiduciary, the Trustee needs the assistance of Mr. Guidry to understand how DC Solar operated. Recovering compensation from the unindicted professional who greatly assisted Carpoff in perpetuating this fraud cannot be discounted.

**Recommendation:**

As outlined above, the defense is constrained by the plea agreement to argue the 3553 factors solely for a concurrent sentence. For the reasons set forth above, despite the

government's desire to have the sentences run consecutively, the defense submits that a concurrent sentence is more than warranted. It is consistent with what other defendants, Hansen and Karmann, received. Unlike Bayliss (36-month sentence - single count), Karmann (72-month sentence - concurrent), or Hansen (96 months - concurrent), Ryan has deposited $250,000.00 with the Clerk of the Court to be applied towards restitution. The nature and circumstances of the offense and the character of Ryan demonstrate that he is not a sophisticated criminal. Instead, he is a blue-collar family man who is loyal to his friends. He's an excellent mentor to fellow employees. He's a dedicated husband and excellent father who takes an active role in his children's life. He's committed to his community and, more importantly, the community's children.

Ryan is not perfect and has made mistakes. He has a problem with drugs and alcohol – but he is addressing these problems head-on.

The plea agreement provides that the government can argue for reducing the sentence by up to 50% pursuant to 5K. The government has filed its recommendation under seal.

The defense submits that the government's recommendation fails to adequately consider the nature and scope of Ryan's cooperation. Neither the Court nor the defense is bound by the government's recommendation. The defense submits that, at a minimum, Ryan should receive the full 50% reduction permitted in the plea agreement.[1]

Constrained by the plea agreement, the defense recommends that running his time concurrent for a 120-month sentence followed by a 50% reduction pursuant to 5K results in a

---

[1] The Plea Agreement does not specifically restrict the defense from arguing for greater than a 50% reduction. However, the language of the plea agreement contemplated a maximum reduction of 50% on the government's motion. Notwithstanding, the recommendation of either party does not bind the Court.

SENTENCING MEMORANDUM          **15** | P A G E          2:20-CR 00003-DAD

sentence of 60 months is consistent with the plea agreement.

The defense would further request that any period of incarceration include a recommendation to the BOP that Ryan participate in the RDAP program and that Ryan is immediately assessed pursuant to the First Step Act for programs that will assist him.

The defense would further seek a recommendation of an institution located near his home in Louisiana capable of providing RDAP and First Step Act programs.

Respectfully submitted,

January 25, 2023

/s Robert M. Wilson

Robert M. Wilson
Attorney for Defendant
RYAN GUIDRY