PHILLIP A. TALBERT
United States Attorney
CHRISTOPHER S. HALES
KEVIN C. KHASIGIAN
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 2:20-CR-03-DAD |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | |
| RYAN GUIDRY, | DATE: January 31, 2023<br>TIME: 9:15 a.m.<br>COURT: Hon. Dale A. Drozd |
| Defendant. | |

This matter is set for sentencing on January 31, 2023. Defendant Ryan Guidry pleaded guilty pursuant to a plea agreement to two counts of an Information charging him with Conspiracy to Commit an Offense Against the United States in violation of 18 U.S.C. § 371 (Count One) and Aiding and Abetting Money Laundering in violation of 18 U.S.C. §§ 2 and 1957(a) (Count Two). ECF 1, 14, 16.

**I.    RECOMMENDED SENTENCE**

Consistent with the plea agreement, the United States recommends that the Court sentence Guidry to the low end of the applicable Sentencing Guidelines range, subject to any additional motion the government may make. Additionally, the government recommends that Guidry's sentence include a two-year term of supervised release, total restitution in the amount of $619,415,950.06 as specified in the PSR, and a special assessment of $200.

Guidry's restitution obligation should be imposed joint and several in its entirety with Jeff Carpoff, Paulette Carpoff, Alan Hansen, Robert Karmann, and Joseph Bayliss, who have already been

GOVERNMENT'S SENTENCING MEMORANDUM

1

sentenced in the case numbers listed in the table below.  Seven people have pleaded guilty in connection with the DC Solar fraud scheme and Judge Mendez has sentenced five of them:

| Defendant | Job Title | Sentence | Case Number |
|---|---|---|---|
| Jeff Carpoff | CEO | 30 years | 2:20-CR-017-JAM |
| Paulette Carpoff | COO | 11 yrs. 3 mos. | 2:20-CR-018-JAM |
| Alan Hansen | Fleet Mgr. | 8 years | 2:20-CR-016-JAM |
| Robert Karmann | CFO | 6 years | 2:19-CR-222 JAM |
| Joseph Bayliss | Electrician | 3 years | 2:19-CR-182-JAM |

Remaining to be sentenced before this Court after reassignment are Ron Roach (2:19-CR-182-DAD) and Mr. Guidry, who was DC Solar's Vice President of Operations.

## II.     NO FORMAL OBJECTIONS

The United States has no formal objections to the final PSR.

## III.     18 U.S.C. § 3553(a) FACTORS

For the reasons stated here and in the PSR, a sentence at the low end of the properly calculated Guidelines range, subject to any additional motion the government may make, is sufficient but not greater than necessary to afford adequate deterrence, promote respect for the law, protect the public from further crimes of the Defendant, and to provide just punishment.  See 18 U.S.C. 3553(a)(2).

Guidry worked at DC Solar from approximately 2012 through 2019 and became Vice President of Operations by 2015.  PSR ¶¶ 7, 14, 85.  Guidry accepted $1 million that he knew came from deceived investors to get a signature on a false lease contract, and split another $20,000 in cash with Hansen for forging a related estoppel agreement.  ECF 13 at 22:10-24:13; PSR ¶¶ 14-17.  Guidry also fabricated a spreadsheet of false mobile solar generator (MSG) location information that he sent to Jeff Carpoff and a broker who pitched DC Solar to investors, and helped trick investors during inspections by moving MSGs around and replacing VIN numbers on MSGs.  ECF 13 at 24:5-25:2; PSR ¶¶ 19-21.  In short, Guidry knew DC Solar was committing fraud and he sought to profit from it.

### A.     Overview of the DC Solar fraud scheme

Intricacies of the DC Solar fraud scheme are detailed at greater length in the factual basis to

GOVERNMENT'S SENTENCING MEMORANDUM

2

Guidry's plea agreement and in the PSR. ECF 13, 45.  DC Solar was a massive Ponzi-like scheme that ultimately defrauded investors of nearly $1 billion. ECF 13 at 16:3-13. The company sold mobile solar generators ("MSGs"), which were essentially solar panels placed on a trailer with wheels such that they could be moved about. ECF 13 at 16:13-16. Investor buyers were looking to obtain renewable energy tax credits and the revenue stream from leasing MSGs to end users. ECF 13 at 16-18. DC Solar's business model was conducive to fraud: investors never took custody of the MSGs, instead leasing them back to DC Solar, who was in turn supposed to sublease them out to end users to generate revenue. ECF 13 at 16:13-17, 17:13-15. Most investors financed their MSG purchases with DC Solar, and therefore owed monthly payments to DC Solar on that debt. ECF 13 at 17:3-11. Sublease revenue was supposed to cover that monthly debt, but for the business model to be sustainable DC Solar had to succeed in subleasing MSGs out to real paying end users, or else the model would collapse. ECF 13 at 17:13-18:7.

The company claimed to investors that there was a robust market for their MSGs, but this was false. ECF 13 at 16:16-19. In truth, there was no substantial market demand for DC Solar's MSGs, and they never secured significant subleases. ECF 13 at 20:1-11. Without sublease revenue, DC Solar quickly became dependent on getting new investor money to pay its obligations to older investors. ECF 13 at 20:11-15. To do so the company hid its failures and faked its success while its products sat unused. ECF 13 at 20:15-19. As DC Solar continued to hemorrhage money without any revenue engine at its core, the company simply stopped building the mobile-solar generators that they claimed to be selling to investors then leasing out. In truth, over 9,000 of the 17,000 MSGs the company sold were never built at all. ECF 13 at 21:12-22. When investors tried to conduct inspections and audit their MSGs, the conspirators including Guidry sought to fool them in various ways, including swapping VIN numbers and temporarily moving MSGs around. ECF 13 at 24:5-25:2. The fraud scheme continued until law enforcement executed searches and seizures in December 2018. ECF 13 at 21:3-22.

B. **Guidry knew DC Solar's business model and that investors were being defrauded.**

Guidry understood DC Solar's business model and he knew the company was not earning sufficient lease revenue to pay its obligations. ECF 13 at 22:4-6. He also knew that the company could not survive if it did not close new investment transactions, and discussed this reality with the Carpoffs

GOVERNMENT'S SENTENCING MEMORANDUM   3

and several others in the company. ECF 13 at 22:7-9. Guidry further knew that Jeff Carpoff was deceiving investors to induce their payments, and that the $1 million Guidry received came from investors that Carpoff was deceiving with Guidry's help. ECF 13 at 22:9-11. Instead of trying to withdraw or stop the fraud, Guidry repeatedly chose to further it.

### C. Guidry helped DC Solar helped fake third-party demand for MSGs and got over $1 million for it.

Guidry helped DC Solar fake third-party demand for its MSGs with false documents. The $1 million Guidry received was in exchange for getting Hansen to sign a contract with Telecom Company A to lease 1,000 MSGs for approximately $1,100 each for at least ten years, a large supposed revenue stream. ECF 13 at 22:10-14. Guidry learned that Carpoff was using the document Hansen signed to deceive other investors into believing that Telecom Company A had agreed to pay fixed rent for the duration of the agreement, which Guidry knew was false. ECF 13 at 22:20-23:3. Rather than exiting the scheme or seeking to stop it at that point, Guidry instead discussed the fraud with other coconspirators and concluded it was not his problem. ECF 23:1-3.

As DC Solar's earliest fund investors approached a five-year ownership "flip" mark, they looked to sell their ownership stake in their MSGs. ECF 13 at 19:8-22. Because most of the tax benefits of MSGs had been used up at that point, prospective new buyers were primarily purchasing the prospective revenue stream from DC Solar's leasing of the MSGs to third parties. ECF 13 at 19:23-28. This is one place where the fraudulent Telecom Company A contract came in handy; Jeff Carpoff used it to tell a prospective flip buyer that 416 MSGs were leased to Telecom Company A for 10 years at a fixed amount, while that was completely false. ECF 13 at 19:23-25. In truth, Telecom Company A never leased 416 MSGs for 10 years at a fixed amount, and instead only leased a tiny fraction of that on an as-needed basis. ECF 13 at 20:20-21:2. When DC Solar sought to reassign the purported revenue stream from 416 of the 1,000 MSGs s supposedly leased by Telecom Company A, they needed an estoppel agreement signed by Telecom Company A. ECF 13 at 23:14-20. The estoppel agreement was designed to back up the lie about Telecom Company A and help close the flip transaction. ECF 13 at 20:27-21:2.

Guidry decided to help the fraud scheme further in exchange for more money by forging the estoppel agreement. The problem was that Hansen (a former Telecom Company A employee) wouldn't

GOVERNMENT'S SENTENCING MEMORANDUM                 4

sign the estoppel agreement, and Hansen told Guidry nobody else at Telecom Company A would either. ECF 13 at 23:20-23. After Jeff Carpoff promised $20,000, Guidry and Hansen hatched their plan to forge the signature of a former Telecom Company A employee on the estoppel agreement. ECF 13 at 23:26-24:1. Guidry then provided the falsified document to Carpoff, who used it to help close the pending $34 million transaction. ECF 13 at 24:1-2. The $34 million flip deal closed, with a bank funding approximately 80 percent of the deal and smaller investors footing the balance. ECF 16 at 19:13-20. Guidry and Hansen split the $20,000 cash that Carpoff pulled from his safe as payment. ECF 13 at 24:2-4. Once again, rather than exiting the scheme or trying to stop it, Guidry chose the other path.

### D. Guidry helped conceal from investors that their MSGs were not in operation and/or had never been built.

As Vice President of Operations, Guidry could have insisted that DC Solar provided investors accurate information about whether their MSGs were in operation or had even been built. Instead, Guidry opted to help deceive investors in a series of increasingly brazen maneuvers. As the most basic example, Guidry compiled a fictional spreadsheet of locations for 416 MSGs using VIN numbers that Jeff Carpoff provided to him. ECF 13 at 24:5-16. Guidry then emailed a copy of that false spreadsheet to Carpoff and to a broker who pitched DC Solar to investors. ECF 13 at 24:13-15. As stated explicitly in his plea agreement that he signed and to which he swore under oath, "Guidry knew the location report was false and that the false report would be delivered to S-Sense in support of the A Group/K Bank transaction."[1] ECF 13 at 24:14-16.

Moving to the next level, in 2017 and 2018 when DC Solar was no longer making the MSGs it was selling, Guidry scraped old VIN stickers off of MSGs and put new ones on them. ECF 13 at 24:16-24. Guidry did this at DC Solar warehouses in Benicia, California and Las Vegas, working with Jeff Carpoff, Bayliss, and others. The whole point of the VIN switching was to trick investors during inspections into believing that MSGs associated with the transaction under inspection existed and could be found at the locations the company had asserted, when the opposite was true. ECF 13 at 24:19-22.

---

[1] A footnote in the PSR notes that through counsel during informal objections, Guidry claimed he "did not know the specific investors or bank transaction referenced in this sentence." PSR at 9 n.3. This contradicts the Plea Agreement to which Guidry swore under oath. ECF 13 at 22:14-16.

GOVERNMENT'S SENTENCING MEMORANDUM

Finally, reaching a brazen level of fraud one might expect to see in movies instead of reality, Guidry and Carpoff scrambled to move MSGs to their supposed operation sites "one day before" and in some cases "on the day of" an investor inspection. ECF 13 at 24:24-25:1. This was done to trick the inspectors into believing those MSGs had been deployed at those sites all along, when the opposite was true. ECF 13 at 25:1-2.

By the time Guidry was creating false reports, scraping VIN numbers, and running around getting MSGs in place hours before customer inspections, the fraud had clearly become his problem too. Guidry was deceiving investors and trying to prevent the fraud scheme that he helped build from being detected and crashing around him. Like other coconspirators sentenced before him, Guidry represents another point that this fraud scheme should have stopped in its tracks instead of getting to almost $1 billion. Instead, Guidry proved himself corruptible and open to sticking around DC Solar to back the fraud for cash, all while knowing that the money he was receiving came from investors that he had helped defraud.

## IV.   CONCLUSION

For the reasons stated above, in the plea agreement, and in the PSR, the government recommends that the Court sentence the defendant Ryan Guidry to the low end of the applicable Sentencing Guidelines range, subject to any additional motion the government may make, a two-year term of supervised release, total restitution in the amount $619,415,950.06 as specified in the PSR, and a special assessment of $200.

Respectfully submitted,

Dated: January 25, 2023

PHILLIP A. TALBERT
United States Attorney

By: /s/ CHRISTOPHER S. HALES
CHRISTOPHER S. HALES
Assistant United States Attorney

GOVERNMENT'S SENTENCING MEMORANDUM    6